RECEIVED
JAN - 4 2013
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **LEE ROY JOYNER, M.D.** | : | **DOCKET NO. 2:12-2516** |
| **VS.** | : | **JUDGE TRIMBLE** |
| **S.F.L. & S.I.L., LLC, ET AL** | : | **MAGISTRATE JUDGE KAY** |

**MEMORANDUM RULING**

Before the court is an appeal from a decision of the Bankruptcy Court in this case. Lee Roy Joyner, M.D. is an unsecured creditor in a Chapter 7 proceeding involving the defendants, Samuel F. Liprie ("Liprie"), S.F.L. & S.I.L., LLC, ("SFL") Deutsche Bank Florida, N.A.("Deutsche Bank"), Shawn Bray Liprie *Inter Vivos* Trust No. 1 ("Liprie Trust"), Wilma D. Liprie, Jon C. Liprie and Mary L. Rahaim. Dr. Joyner appeals the rulings of the Bankruptcy Judge in a Memorandum Opinion issued April 4, 2012 and order issued July 17, 2012.

Defendants SFL, the Liprie Trust, Wilma D. Liprie, Jon C. Liprie and Mary L. Rahaim are non-debtor defendants which Dr. Joyner contends received profits from a joint venture in which he owned a 25% interest. Samuel F. Liprie is the debtor and also a 75% owner of the joint venture. In his second amended complaint, Dr. Joyner seeks to recover assets stolen from him and he also seeks damages against the non-debtor defendants for their participation and/or compliance with a fraudulent scheme to conceal and remove stolen assets and/or profits of the joint venture from Dr. Joyner's reach. Dr. Joyner's amendedcomplaint includes numerous Louisiana state law claims.

In the bankruptcy proceeding, non-debtor defendants, Deutsche Bank and SFL filed motions

to dismiss[1] the second amended complaint asserting that only the Chapter 7 trustee has standing to bring the state law claims. The bankruptcy judge agreed and dismissed Dr. Joyner's complaint.

## FACTUAL ALLEGATIONS

Dr. JOyner makes the following allegations in his second amended complaint. In the 1980s, Samuel F. Liprie, a nuclear pharmacist and inventor, invented technology involving a catheter coated with radiation to aid in the cleaning of scar tissue and plaque from clogged arteries.[2] The Federal Drug Administration prohibited Liprie[3] from using the technology because it was dangerous.

In Liprie I, a case filed in a Louisiana state court, the court held that Liprie defrauded Dr. Joyner in a 1993 convertible debentures transaction. In February, 1996 Dr. Joyner was awarded $267,990.71.[4] Liprie paid that judgment.

In 1994, Dr. Joyner, a pulmonologist and medical researcher, Liprie , and Mark Harrison, M.D. entered into a joint business venture to develop and market a heart catheterization system known as intra coronary radiation therapy (referred to as the "Angiorad" technology).[5] According to the oral agreement, Dr. Joyner would be entitled to a 25% ownership interest in the joint venture which would entitle him to 25% of all profits realized by the business venture.[6] In return for the 25%

---

[1] Adversary Proceeding No. 11-2003, R. #69-70 (R. #4-73, 4-74 in this proceeding) and R. #64 ((R. #6-8 in this proceeding).

[2] R. #5-17, amended complaint.

[3] And Omnitron International, Inc., a company Liprie founded.

[4] Joyner v. Liprie, 896 So.2d 363 (La.App. 2 Cir. 2005).

[5] Id.

[6] Id.

ownership interest, Dr. Joyner contributed financial backing to fund Liprie's salary of $150,000 per year, as well as other related development expenses for the technology; the funding also covered testing in Venezuela for the new technology. Dr. Joyner also contributed input regarding the technology.[7] Dr. Joyner was also responsible for publishing the results of the study in the Journal for the American College of Cardiology ("ACC") and at the ACC convention. At the time, Liprie lacked the funds to develop the Angiorad technology.[8]

After many months of work funded by Drs. Joyner and Harrison, Liprie devised a much improved, safer version of the catheter; testing proved to be highly successful.[9] In early 1995, Liprie bought out Dr. Harrison's interest in the Angiorad joint venture and sought to buy out Dr. Joyner's interest.[10] Dr. Joyner rejected Liprie's offer.[11] Liprie then withdrew his offer.[12]

Shortly thereafter, Liprie, through his attorneys, demanded that Dr. Joyner not attend the American College of Cardiology convention that would publish the successful test results for the catheter, and refrain from mentioning his interest in the Angiorad venture. Dr. Joyner arranged for the study to be published in February 1995 in the Journal for the American College of Cardiology. Liprie threatened to sue Dr. Joyner if he did not comply with these demands. At the convention, one of the Venezuelan doctors that had tested the technology spoke about the highly successful test

---

[7] Id.

[8] Id.

[9] Id.

[10] Id.

[11] Id.

[12] Id.

results.[13] Shortly after the convention, the United States Surgical Corporation ("USSC") and other investors began negotiating with Liprie for the licensing of the Angiorad technology. Liprie intentionally concealed these negotiations from Dr. Joyner.

On March 14, 1995, Liprie advised Dr. Joyner that he was expelled from the business venture. On February 8, 1996, Dr. Joyner filed suit against Liprie seeking his ownership interest and 25% of all profits from Angiorad ("Liprie II").[14] On September 6, 1996, Liprie agreed to license the Angiorad technology to USSC. The evidence of record reveals that Liprie collected profits through a series of payments totaling $17 million from the technology.[15] From 9/16/1996 until 7/1/1999, payments totaling $16,395,000 were made to Liprie.[16] From 12/31/96, payments were made to Liprie through Angiorad, L.L.C. totaling $744,734.[17] Liprie attempted to conceal the licensing agreement from Dr. Joyner as well as the transfer of profits to various entities.

The matter proceeded to jury trial in October 2008. The jury found that the three doctors entered into an oral agreement which provided Dr. Joyner with a 25% ownership interest in the Angiorad joint venture, that Liprie had defrauded Dr. Joyner out of his 25% share of profits, and that Liprie had breached his fiduciary duties as Dr. Joyner's partner.[18] The jury awarded Dr. Joyner 25%

---

[13] Amended Complaint, ¶ 3(L).

[14] The suit is referred to as Liprie II.

[15] Second Amended Complaint, ¶ 3(M) and 4. Lee Roy Joyner , M.D. v. Samuel f. Liprie, et al, 33 So.3d 242, 248 (La.App. 2 Cir. 1/29/10).

[16] Amended Complaint, R. #5-12, ¶ 7(A).

[17] R. #5-12, ¶ 7(B).

[18] Joyner, 33 So.3d at 249.

of the $17 million in profits received by Liprie, or $4.3 million, plus legal interest, costs and attorney fees.[19] The jury in Liprie II unanimously found that "Dr. Joyner owned 25% of the profits from the joint venture."[20] Judgment was entered on November 10, 2008. Liprie II was affirmed by the Court of Appeal and writs were denied by the Louisiana Supreme Court.[21] Now, because of 14 years of interest accrual and attorney fees, that judgment is worth over $12 million.

On April 28, 2004, the Liprie I trial court found that Liprie had defrauded Dr. Joyner in the debenture transaction referred to herein above.[22] Liprie filed a suspensive appeal; oral arguments were held in late 2004.[23] During the arguments, it was indicated that the appellate court would affirm the judge's finding of fraud and breach of fiduciary duty.[24]

Shortly thereafter, in 2005, Liprie began creating and organizing entities wherein he transferred the profits from the joint venture.[25] Without Dr. Joyner's permission, Liprie transferred proceeds from the licences issued for the Angiorad technology to the S.F.L. and the Liprie Trust.[26] Liprie appointed his CPA, Charles Stulb as the sole manager of SFL and Deutsche Bank as the

---

[19] Id.

[20] Amended complaint, ¶ 6(A)(b) R. #5-17.

[21] Id.; Id. 45 So.3d 1043.

[22] Joyner v. Liprie, 896 So.2d 363, 368 (La.App. 2 Cir. 2005).

[23] R. #5-17, ¶ 8.

[24] Id.

[25] Original complaint, ¶ ¶ 8 and 9, R. #5-12.

[26] Shawn Bray Liprie was Liprie's wife at the time and also the named beneficiary of the Liprie Trust, R. #5-17, ¶ 13. Other named beneficiaries of the Liprie Trust are non-debtor defendants, Wilma Liprie, Jon Liprie, Mary Rahaim and Amy Spence.

Trustee of the Liprie Trust. Liprie also donated his 99% interest in SFL to Deutsche Bank. Deutsche Bank accepted the donation in its capacity as Trustee for the Liprie Trust.

Deutsche Bank was aware of Dr. Joyner's pending fraud suits against Liprie; the Bank retained Stulb as SFL's sole manage for over seven years.[27] Deutsche Bank's Chief Fiduciary Officer headed a committee to oversee Deutsche's compliance with its fiduciary obligations regarding the Liprie Trust.[28] The Liprie Trust expressly prohibited payment of any of Liprie's debts.[29]

Even though as SFL's manager, Stulb had the discretion to make distributions, he did not have the authority to loan any SFL proceeds to anyone, including members. Stulb apparently had control of Liprie's employer (P.E.T. Imaging) and salary.[30] Stulb made no distributions to the Liprie Trust's income beneficiaries.[31] Stulb made significant distributions to Liprie; Deutsche Bank either approved or ratified the distributions.[32] At Liprie's direction, Stulb paid the trust taxes, appraised trust assets, made unauthorized loans to Liprie and managed the Trust assets.[33]

Deutsche named Liprie as co-fiduciary of the Liprie Trust.[34] Deutsche Bank did not contact

---

[27] Amended complaint, R. #5-17, pp. 27-31.

[28] Id., ¶ 50.

[29] Id., ¶ 53.

[30] Id., ¶ 37.

[31] Id., ¶ 61.

[32] Id., ¶ 65.

[33] Id., ¶ 63.

[34] Id., ¶ 60.

the beneficiaries of the Liprie Trust to find out their income needs and or advise them that the Trust existed.[35] Deutsche Bank placed no restrictions on Stulb or Liprie as to the Liprie Trust.

During the pendency of Liprie II, and up until March 13, 2009, the date the judgment against Liprie became subject to execution, Liprie concealed the fact that he had placed Dr. Joyner's property (the Angiorad proceeds) into the entities; these entities are named defendants herein.[36] Dr. Joyner discovered that defendants had converted his property through information he received pursuant to the judgment debtor examination after the Judgment was rendered.[37]

Dr. Joyner alleges that Liprie has removed funds from both the Liprie Trust and SFL in the pretext of a loan.[38] He asserts that the Liprie Trust and SFL are alter egos of Liprie and therefore liable for the debt owed by Liprie to Joyner.[39] Dr. Joyner further asserts that the transfer of the Angiorad joint venture profits to the Liprie Trust and SFL were fraudulent and made for the sole purpose of avoiding payment to him making such transactions null and void.[40]

Dr. Joyner alleges that while Liprie had the right to place assets belonging to himself into the Liprie Trust and SFL, Liprie had no right to place any funds belonging to Dr. Joyner in any trust or company. Dr. Joyner asserts a claim for unjust enrichment and seeks to disgorge assets including

---

35 Id., ¶ 61.

36 Id. ¶ 11.

37 Id.

38 Id. ¶ 14.

39 Id.

40 Id. ¶ 15.

civil fruits.[41]

Dr. Joyner alleges that Deutsche Bank has in its possession approximately $12 million in trust funds (in cash or cash equivalents), of which $9 million belongs to him. Dr. Joyner seeks a judgment ordering defendants to deliver to Dr. Joyner $9 million ($4.3 million plus civil fruits). Dr. Joyner alleges that Liprie fraudulently failed to remit to him his 25% share of the profits. Dr. Joyner alleges that Liprie misappropriated Dr. Joiner's portion of each payment by fraudulent conduct, practice, and/or misrepresentations which constitutes theft under Louisiana Revised Statute 14:67.[42] Dr. Joyner asserts that Liprie's actions constitute a pattern of racketeering under Louisiana Revised Statute 15:1352(c) because the repeated violations of Louisiana Revised Statute 14:67 occurred over a period of three years.

Dr. Joiner alleges the following with respect to Liprie's series of transactions that involved the profits from the Angiorad technology:

> 1993 - Dr. Joyner enters into convertible bond transaction involving Liprie's company, Omnitron International, Inc.
>
> 1994 - Dr. Joyner, Dr. Harrison and Dr. Liprie enter into the Angiorad joint venture.
>
> March 1995 - Liprie attempts to expel Dr. Joyner from joint venture.
>
> February1996 - Dr. Joyner sues Liprie (Liprie I) (Liprie II).
>
> September 1996 - Liprie starts receiving payments for Angiorad technology.
>
> 1998 - Liprie marries Shawn Bray of Connecticut; while married Liprie uses proceeds from the Angiorad technology to purchase a $3 million home in Connecticut.

---

[41] Id. ¶ 16.

[42] R. #5-17.

1999- Liprie builds an expensive home on Big Lake with Angiorad proceeds; no mortgage was involved.

May 12, 2001 - Liprie forms S.F.L. & S.I.L. Limited Partnership ("Texas LP")

> At or before this time, Liprie formed two revocable Texas living trusts– S.F. Liprie Living Trust and S.I Liprie Living Trust. Liprie and the two Texas living trusts were the general partners of the Texas LP. Liprie owns 1% of the Texas LP, S. I. Liprie Living Trust owns 1% and S.F. Liprie Living Trust owns 98%. Dr. Joyner alleges that Liprie deposited Angiorad proceeds and proceeds stolen from Dr. Joyner's fraud and breach of fiduciary duty into the Texas LP.

2004 - the Texas LP has liquid assets of $10,610,828.[43]

Late 2004 (and after oral arguments in Liprie I,) Liprie hires tax attorney, Bob Casey who specializes in transactions and estate planning and is Liprie's current lawyer for "estate planning."

January 24, 2005 - Liprie revokes the Texas S. F. Liprie Living Trust (which owned 98% of the Texas LP) causing the 98% interest to revert back to Liprie (making Liprie a 99% owner of the Texas LP).

January 25, 2005 - Liprie forms S.F.L. & S.I.L., LLC ("SFL")(Liprie is 99% owner and Liprie's surviving Texas Trust and the S.I.L. Liprie Living Trust is a 1% owner. The Articles of Organization provides that SFL will be managed by managers instead of members.

January 25, 2005 - Liprie transfers the $3 million home into SFL for no consideration.

January 25, 2005 - Liprie transfers several valuable lots on Big Lake for no consideration.

January 25, 2005 - Liprie transfers to SFL for no consideration his 75% ownership in his new company, P.E.T. Imaging of SWLA, LLC (P.E.T.).

January 31, 2005 - Liprie merges the Texas LP which possess $10.1 million in cash into SFL. Sometime thereafter Liprie appoints his CPA, Charles Stulb as manager. CPA Stulb has authority to make distributions to members, and controls Liprie pay with respect to P.E.T. Imaging.

February 21, 2005 - Liprie purchases with $2 million of Angiorad technology proceeds, a $6

---

[43] Charles Stulb, Liprie's long-time CPA, testified as to the amount of assets. Amended complaint, ¶¶ 20 and 21, R. #5-17.

million life insurance policy. Liprie swears in the insurance application that as owner of P.E.T., he earns $250,000 annually and his net worth is $22,659,800.

February 23, 2005 - Liprie requires his wife, Shawn, to personally lease from SFL the Connecticut home; no lease payments are made.

March 21, 2005 - Liprie's interest in SFL is worth $12 million.[44]

March 21, 2005 - Liprie amends SFL's Operating Agreement to reflect change in ownership– Liprie is a 99% owner and S.I.L. Liprie Living Trust is a 1 % owner.

March 21, 2005 - Liprie, as settlor, forms an irrevocable spendthrift trust – the Shawn Bray Liprie *Inter Vivos* Trust No. 1 ("Liprie Trust") originally naming Shawn Bray as sole beneficiary.

March 21, 2005 - Liprie donates his 99%membership in SFL to Deutsche Bank by act of donation; Deutsche Bank accepts the donation as Trustee for the Liprie Trust. The Liprie Trust specifically prohibits the payment of Liprie's debts. Deutsche Bank does not contact the beneficiaries of the Liprie Trust to advise them of the Trust's existence, or to learn of their income needs. No distributions are made to the beneficiaries.

May 13, 2005 - Shawn Bray files for divorce.

December 9, 2005 - Liprie, represented by attorney Bob Casey, sues Deutsche Bank to revoke his wife's beneficial interest in the Liprie Trust, or revoke Liprie's donation to the Liprie Trust of his 99% ownership interest in SFL. Deutsche was never served; Liprie dismisses complaint against Deutsche Bank.

March 10, 2006 - Liprie transfers to SFL without consideration his 1% interest in the Texas Living Trust.

May 18, 2006 - CPA Stulb as manager of SFL and without authority, loans Liprie $600,000 to fund Liprie's divorce settlement. No loan application or financial statements were provided. Deutsche Bank does not object to the loan.

October 31, 2008 - Dr. Joyner is awarded $4.3 million jury award in Liprie II.

2009- During discovery of debtor examination, Dr. Joyner discovers that Liprie has transferred the proceeds of the Angiorad technology to the various entities beyond Dr. Joyner's reach.

---

[44] Depending upon the value of P.E.T. Imaging.

July 9, 2009 - Dr. Joyner files suit in state court against Liprie, SFL, Deutsche Bank,[45] the Liprie Trust , Wilma Liprie, Jon Liprie, Mary Rahaim and Amy Spence[46] ("Liprie III") to recover converted property and civil fruits.

2010 - Liprie, with permission from Deutsche Bank, transfers about $3 million out of the Liprie Trust to invest in a Colorado Springs hotel.

December 8, 2010 - Liprie files Chapter 7 bankruptcy in the United States Bankruptcy Court.

February 18, 2011- Dr. Joyner files a proof of claim in Liprie's Chapter 7 bankruptcy proceeding. The claim is for the Liprie II Judgment.

Dr. Joyner alleges that when he filed for bankruptcy, Liprie's debtor schedules show him to have a net worth, exclusive of non-exempt assets, of zero with an annual salary between $51,000 to $90,000 plus dividend income.

Dr. Joyner asserts that the non-debtor defendants knew or should have known that Liprie took these steps to place the proceeds from the Angiorad technology out of Dr. Joyner's reach, thereby insulating them from a Liprie II judgment and preserving the corpus for Liprie until after Liprie's bankruptcy. Dr. Joyner complains that he was unaware of where the Angiorad assets were until he began conducting the judgment debtor discovery after Liprie II was final.

Dr. Joyner alleges in his amended complaint that Louisiana law allows a victim to recover property that has been stolen.[47] Dr. Joyner alleges that a sham donation to trusts or other enterprises set up seven years prior to filing bankruptcy constitutes an avoidable simulation which has no effect

---

[45] Deutsche is the Trustee of the trust.

[46] Wilma, Jon, Mary and Amy are beneficiaries of the trust.

[47] Citing Succession of Onorato, 51 So.2d 804, 810-811 (La. 1951) and La.R.S. 9:1736, et. seq.

upon the creditors or the donor.[48] Dr. Joyner alleges that the non-debtor defendants are liable, *in solido,* for the damages they caused by jointly participating in the scheme to defraud Dr. Joyner out of his interest in the proceeds of the Angiorad joint technology.

In his second amended complaint, Dr. Joyner alleges the following causes of action: (1) single business enterprise, (2) alter ego (and related veil-piercing theories), (3) simulation and related Guillot claims, (4) aiding and abetting debtor's fraud, (5) aiding and abetting breach of fiduciary duty, (6) aiding and abetting conversion of Dr. Joyner's funds, (7) management of affairs of another, (8) payment of thing not owed- quasi-contractual action and reimbursement, (9) unjust enrichment (10) revendicatory action, (11) revocatory action, (12) nullity for breach of public policy, (13) Racketeering under Louisiana Revised Statute 15:1352, (14) accounting, (15) resulting and constructive trust, and (16) injunctive relief.

## STANDARD OF REVIEW

A district court hearing an appeal from bankruptcy court reviews a bankruptcy court's findings of fact for clear error and conclusions of law *de novo.*[49]

## LAW AND ANALYSIS

Property of the estate includes "all legal or equitable interests of the debtor in property as of commencement of the case."[50] The term "all legal or equitable interests" has been defined broadly

---

[48] Citing In Re Guillot, 250 B.R. 570 (M.D. La. 2003).

[49] In re Seven Seas Petroleum, Inc., 522 F.3d 575, 583 (5th Cir. 2008).

[50] 11 U.S.C. § 541(a)(1)(1988).

to include causes of action[51] such as claims based on state or federal law.[52] If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim. [53] However, a trustee has no power to assert any claim on behalf of a creditor when the cause of action belongs solely to that creditor.[54]

Whether a particular state law claim belongs to the bankruptcy estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case.[55] A court must look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury.[56] "The injury characterization analysis should be considered as an inseparable component of whether an action belongs to the [estate] or [creditor]."[57] "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate."[58] "Conversely, if the cause of action does not

---

[51] Louisiana World Exposition v. Federal Ins. Co., 858 F.2d 233, 245 (5th Cir. 1988)("Section 541(a)(1)'s reference to 'all legal or equitable interests of the debtor in property' includes causes of action belonging to the debtor at the time the case is commenced.")

[52] See Am. Nat'l Bank of Austin v. MortgageAmerica Corp., 714 F.2d 1266, 1274 (5th Cir. 1983).

[53] See Matter of S.I. Acquisition, Inc., 817 F.2d 1142, 1153-54 (5th Cir. 1987).

[54] In re Rare Coin Galleries of America, 862 F.2d 896, 900 (1st Cir. 1988).

[55] In re Educators Group Health Trust, 25 F.3d 1281, 1284 (citing S.I. Acquisition, Inc. v. East-way Delivery Serv., Inc., 817 F.2d 1142 (5th Cir. 1987); In re MortgageAmerica, 714 F.2d 1266, 1275-1277 (5th Cir. 1983).

[56] Id., at 1284-85.

[57] In re E.F. Hutton, 103 B.R. 808, 812 (Bnkrtcy N.D. Tex. 1989).

[58] In re Educators Groups Health Trust, 25 F.3d at 1284 (citations omitted).

explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."[59]

It is entirely possible for a bankruptcy estate and a creditor to own separate claims against a third party arising out of the same general series of events and broad course of conduct.[60] Whether the claims will ultimately prove to be legally or factually valid is not the court's concern, rather the narrow question is whether the claims belong to the estate or to the creditor.[61]

Dr. Joyner, the appellant, posits that taking the allegations of his First Supplemental and Amending Restated Complaint to Original State Court Petition (the "Amended Complaint") as true, title to Dr. Joyner's ownership interest in 25% of Angiorad and upon its dissolution, 25% of its assets, never transferred to Liprie. Consequently, the appointed Bankruptcy Trustee does not have the right to assert Dr. Joyner's claims for the estate because under Louisiana law the assets were never owned by Liprie.

Dr. Joyner complains that the bankruptcy court relied on cases that failed to address the issue – specifically, whether claims to recover assets that never belonged to the estate may be brought by the person from whom those assets were taken. Dr. Joyner maintains that the assets he seeks to recover- his 25% ownership in the Angiorad technology translated into a $4.3 million judgment with interest and attorney fees via a jury award– are assets that never belonged to Liprie's estate. Dr. Joyner posits that because Liprie stole his profits and transferred them into the various entities out side of the reach of Dr. Joyner, these assets do not belong to the bankrupt estate because they never

---

[59] Id.

[60] Id.

[61] In re Seven Seas Petroleum, Inc., supra.

belonged to Liprie in the first place. Therefore, the entities that Liprie facilitated and/or utilized (Deutsche Bank, SFL and the various trusts and limited partnership, who are the non-debtor defendants) are liable to Dr. Joyner for the proceeds they illegally received as part of Liprie's continued scheme to steal and/or conceal the Angiorad joint venture profits.

**FINDINGS OF THE BANKRUPTCY COURT**

The instant lawsuit was originally filed in state court. After defendant Liprie filed for bankruptcy, defendants removed the suit to this court, contemporaneously filing a motion to refer the civil action to the Bankruptcy Court. After hearing oral arguments, the undersigned referred the action to the Bankruptcy Court pursuant to 28 U.S.C. 157(a) and Local Rule 43.4.1.[62]

Defendants, Deutsche Bank and S.F.L. filed motions to dismiss arguing that Dr. Joyner's claims are estate claims that can only be asserted by the appointed Chapter 7 Trustee, Rudy O. Young. After hearing oral arguments, the court granted the motions to dismiss finding that Dr. Joyner lacked standing to bring the claims asserted because the appointed trustee had the exclusive standing to bring said claims.

*Revendicatory action and resulting and constructive trust*

In his amended complaint, Dr. Joyner seeks to recover profits from the Angiorad joint venture through a revendicatory action; he also seeks to impose a resulting or constructive trust on the proceeds of the joint venture. A revendicatory action is an action brought by the owner of a corporeal movable for the recognition of his ownership and delivery of possession. "The owner of a thing is entitled to recover it from anyone who possesses or detains it without right and to obtain

[62] Joyner v. Liprie, et al, Civ. Action 2:11-0308, R. #34, dated 04/19/2011.

judgment recognizing his ownership and ordering delivery of the thing to him."[63]

The Bankruptcy Judge noted that Dr. Joyner had alleged that he had an ownership interest in the Angiorad proceeds allegedly transferred to the non-debtor defendants because these proceeds represented Dr. Joyner's share of the Angiorad profits stolen by Liprie.[64] The Judge remarked that Dr. Joyner pointed to the jury's verdict in Liprie I [sic][65] which awarded Joyner damages for Liprie's fraudulent conduct and breach of fiduciary duty.

In the instant suit (Liprie III), Dr. Joyner alleges that the assets transferred to the non-debtor defendants were his stolen property which cannot be estate property and recoverable by the Trustee. Dr. Joyner relies on Succession of Onorato,[66] which holds that a thief has no title whatsoever to stolen property. Dr. Joyner remarks that appellees have failed to explain how under Louisiana law Liprie, one who never acquired title to the stolen Angiorad technology profits could transfer said property that belonged to Dr. Joyner, which would ultimately end up in his bankrupt estate. The Judge concluded that Dr. Joyner had not pled facts to support his contention that the transferred assets were his property versus estate property. The Judge relied on the state court judgment which is as follows:

> The jury, considering the law, evidence and argument of counsel, answered the Verdict Form propounded by the Court and found the defendant liable unto the

---

[63] Louisiana Civil Code art. 526.

[64] R. #5-37, p. 18.

[65] We believe the Bankruptcy Judge meant Liprie II, the action involving Dr. Joyner's claims regarding the Angiorad technology and his claim for 25 % ownership interest in the profits. Liprie I involved another fraudulent business transaction in which Dr. Joyner was awarded a judgment; Liprie paid this judgment.

[66] 51 So.2d 804, 812 (La. 1951).

> plaintiff for breach of contract, breach of fiduciary duty and fraud and found damages for plaintiff in the amount of $4,300,000.
>
> IT IS ORDERED, ADJUDGED AND DECREED that the jury verdict be and is hereby made the judgment of this court and accordingly judgment is hereby rendered in favor plaintiff, Lee Roy Joyner, and against Samuel F. Liprie, in the amount of FOUR MILLION, THREE HUNDRED THOUSAND ($4,300,000) DOLLARS . . . .

The Bankruptcy Judge then determined that because Dr. Joyner was awarded a money judgment, and neither the judgment nor the jury's verdict granted Joyner an ownership interest in any of the proceeds that Liprie allegedly transferred to the non-debtor defendants, the money judgment did not "automatically give a prevailing party a direct ownership interest in the specific property that is the subject of the lawsuit."[67] In other words, the Bankruptcy Judge concluded that the Liprie II judgment made no finding that Dr. Joyner had an ownership interest with respect to any of the Angiorad proceeds allegedly transferred to the non-debtor defendants.

The Bankruptcy Judge further concluded that Dr. Joyner's request to impose a resulting or constructive trust suffered from a similar flaw in that Dr. Joyner did not obtain relief from any court imposing a constructive trust on any of the property in the possession of any of the defendants before the bankruptcy case was filed.[68] We agree with the Bankruptcy Judge's conclusion that the resulting or constructive trust claim must be dismissed because Dr. Joyner has failed to allege that a prior court has recognized a constructive trust as to the assets at issue.

However, we respectfully disagree with the Bankruptcy Judge's conclusion that Dr. Joyner has failed to allege an ownership interest in the property he seeks to recover. The Bankruptcy Judge

---

[67] Id., p. 19.

[68] Citing In re Moore, 608 F.3d 253, 263 (5th Cir. 2010).

relies on the Judgment awarding Dr. Joyner $4,300,000. The Judge remarked that there was nothing in either the judgment or the jury verdict which granted Dr. Joyner an ownership interest in any of the proceeds that Liprie allegedly transferred to the non-debtor defendants. In a footnote, he remarked that the "present action focuses on the transfer of proceeds from the joint venture, not a transfer of Joyner's ownership interest in Angiorad."[69] He further reasoned that because the judgment was a money judgment, this did not give Dr. Joyner an ownership interest in the specific property that was the subject of the lawsuit. Because Dr. Joyner had alleged no facts that would give him an ownership interest in the assets, he should be treated only as a unsecured creditor in the bankruptcy suit. Consequently, any of the Angiorad proceeds transferred to the non-debtor defendants are subject to recovery by the Trustee, and any recovered property would flow into the bankruptcy estate. Of course this assumes that the Bankruptcy Trustee will attempt to recover these assets and that recovery is possible under the bankruptcy rules.

Partnership shares or joint venture interests are incorporeal movables.[70] With respect to partnerships, the property or stock of an enterprise form a community of goods in which each party has a proprietary interest.[71] Upon dissolution, after debts are paid, the surplus is divided among the partners proportionately based on their respective interests in the partnership.[72] Dr. Joyner argues that his share in the Angiorad Joint Venture conferred on him the right to share in its assets and proceeds upon dissolution. Dr. Joyner maintains that while Liprie's interest in the Angiorad technology is part

---

[69] R. #5-37, Memorandum Opinion, p. 19, fn. 5.

[70] La. Civ. Code art. 473.

[71] La. Civ. Code art. 2808. Darden v. Cox, 240 La. 310, 123 So.2d 68 (La. 1960).

[72] La. Civ. Code art. 2833.

of the bankruptcy estate, Dr. Joyner's interest is not.

The Amended Complaint alleges that Liprie "hired skilled professionals to begin placing his Angiorad joint venture assets, including the assets Liprie fraudulently misappropriated from Dr. Joyner, into various entities Liprie created in an attempt to place them beyond the reach of Dr. Joyner."[73]

We recognize that the judgment awards Dr. Joyner a money judgment. However, the Jury Verdict Form concluded that Dr. Joyner was entitled to a 25% ownership interest in the joint venture.[74] The Jury Verdict Form provides in pertinent part the following:

> 1. Do you find more likely than not, Dr. Joyner, Dr. Harrison and Sam Liprie entered into a joint venture agreement to develop and market medical technology?
> Yes _X_ No___
>
> 2. Do you find that Dr. Joyner met his obligations under the joint venture agreement so as to entitle him to any ownership interest in any such joint venture?
> Yes_X_ No___
>
> 3. What percentage of the joint venture do you find Dr. Joyner is more likely than not entitled to?
> __25%__
>
> * * *
>
> 7. What amount of damages, if any, is Dr. Joyner entitled to recover from Sam Liprie?
> __$4.3 million__[75]

---

[73] Amended Complaint, R. #5-17, ¶ 9.

[74] Plaintiff's exhibit 5 (R. #5-8).

[75] Id.

The Judgment made the Jury Verdict Form "the judgment of the court."[76] Dr. Joyner, in his petition for damages in the state court proceedings (Liprie II) alleges that he is a 25% owner in Angiorad, Ltd., a closely held corporation formed to manufacture, sell and distribute a unique heart catheterization system utilizing radioactivity.[77] Dr. Joyner argues that the Jury Verdict From clearly establishes his 25% ownership interest in the joint venture. Dr. Joyner submits that he did not uncover Liprie's 2003-2008 fraudulent transfers until well after the Liprie II judgment.

Taken as true, we find that the allegations in the amended complaint allege an ownership interest in the Angiorad joint venture. At no point in any of the litigation between Dr. Joyner and Liprie, is the court aware of any dispute by Liprie that Dr. Joyner owned a 25% interest in the joint venture. Liprie bought Dr. Harrison's 25% interest and then negotiated unsuccessfully to purchase Dr. Joyner's interest. The jury, having considered all the testimony and the exhibits at the trial in Liprie II concluded as quoted above that Dr. Joyner owned a 25 % interest in the joint venture. The judgment in Liprie II in addition to rendering an award in favor of Dr. Joyner against Liprie in the amount of $4.3 million, stated that "the jury verdict be and is hereby made the judgment of this court." This court deems it beyond question and established through litigation that Dr. Joyner owned 25% of all the assets of the joint venture, notwithstanding the fact that the judgment in Liprie II did not specifically include language to that effect. To conclude otherwise would simply put form over substance and create an injustice to the detriment of Dr. Joyner. This court makes no conclusions as to the merits of Dr. Joyner's claims, but is satisfied that he has made sufficient allegations based

[76] Dr. Joyner exhibit 1, R. #5-8.

[77] Exhibit B, attached to Memorandum in Opposition to Motion to Remand or Alternatively to Abstain filed by S.F.L. & S.I.L., L.L.C., R. #4-16.

upon established facts (his 25% ownership interest in the joint venture) that should allow him an opportunity to prove his case after a fair and complete hearing.

As to the nature of the injury, plaintiff alleges that Liprie took profits that represented Dr. Joyner's 25% ownership interest in the Angiorad joint venture and attempted to conceal and place these profits out of Dr. Joyner's reach. We find that Liprie's, if proved, such actions caused a direct injury to Dr. Joyner. We fail to see how this could have injured Liprie and thus made Dr. Joyner's claims derivative of an injury to Dr. Joyner given that Liprie would be the wrongdoer.

Because we find that Dr. Joyner had an ownership interest in the joint venture, (which the Jury Verdict Form made the Judgment of the court also concluded), Dr. Joyner's factual allegations would establish the elements of a revendicatory action. We find it of no moment that the jury awarded Dr. Joyner a money judgment given the fact that Liprie had sold the Angiorad technology licensing to various medical entities, such as USSC, and received over $17 million in profits. Liprie allegedly took these profits, 25% of which, according to the jury verdict form and jury award, rightfully belonged to Dr. Joyner and transferred them into the various entities in order to fraudulently misappropriate the profits. Pursuant to the revendicatory action, Dr. Joyner would have a legal right to be placed in possession of the profits from the Angiorad technology. Liprie's alleged theft of Dr. Joyner's 25% interest in the Angiorad joint venture would be a direct injury to Dr. Joyner. While this cause of action arises out of the same general series of events and broad course of conduct, the estate cannot assert this cause of action. This cause of action is entirely independent of any cause of action the trustee might bring to benefit the estate and/or creditors of the estate. However, we make this conclusion taking the allegations as true and without deciding the merits of the claim.

*Revocatory action*

"An obligee has a right to annul an act of the obligor, or the result of the failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency."[78] The bankruptcy judge concluded that Dr. Joyner's revocatory action fell within the province of the Chapter 7 trustee's avoidance powers under 11 U.S.C. 544(b) because the revocatory action is grounded on a fraudulent conveyance theory. Again, Dr. Joyner alleges that he seeks the return of "non-estate assets" transferred to non-debtor defendants. Finding that Dr. Joyner had failed to allege sufficient facts to establish that he had a direct ownership interest in the assets transferred to the non-debtor defendants because of the money judgment, the Bankruptcy Judge reasoned that the Chapter 7 Trustee could avoid the transfers or recover the value of the transfers from the immediate or mediate transferees for the benefit of the bankrupt estate because the amended complaint does not allege a basis for damages to Dr. Joyner apart from what the trustee is entitled to recover for the estate under section 544(b) and 550(a). Again, we respectfully disagree as we conclude that the Jury Verdict Form, Judgment and the allegations in the amended complaint, taken as true, are sufficient to prove an ownership interest in the Angiorad technology joint venture.

*Simulation, related Guillot claims and nullity*

In this cause of action, Dr. Joyner alleged that Liprie's transfer of assets to the various entities were sham transactions subject to nullification under In re Guillot.[79] Under Louisiana law, a

[78] La. Civ.Code art. 2036.

[79] 250 B.R. 570 (Bankr. M.D. La. 2003).

simulation is a contract that by mutual consent does not express the true intent of the parties.[80] An absolute simulation has no effect between the parties because they intend that their contract produce no effects between them.[81] A relative simulation is a transaction in which the parties intend that their agreement produce effects between them that differ from those recited in the contract.[82] Disguised donations are relative simulations; they are distinguished from simulations by the fact that a relative simulation on its face appears to be a valid transfer, although the parties intended that the transfer be a gift, rather than a transfer.[83] Dr. Joyner alleges in his amended complaint that Liprie made donations to the non-debtor defendants (in the Liprie Trust), even though the familial beneficiaries were unaware of the Trust and their beneficiary status. Dr. Joyner alleges that the purpose of the Trust was a sham in order to preserve the corpus for Liprie until after the bankruptcy.

Dr. Joyner remarks that SFL argues that Dr. Joyner does not have standing to bring this action because if the donations were nullified, the property would revert back to Liprie, and then ultimately the estate. Dr. Joyner maintains that he is seeking the return of ***his*** assets that were wrongfully converted by Liprie to the non-debtor defendants. He also seeks damages for the non-debtors' tortious activity which harmed him personally.

The Bankruptcy Judge concluded that this cause of action sought to avoid a fraudulent conveyance that could be brought only by the Trustee because Dr. Joyner failed to allege a sufficient

---

[80] La.Civ. Code art. 2025; Succession of Terral, 312 So.2d 296, 299 (La. 1975)(simulated contract has no existence in fact and may be declared a sham).

[81] La.Civ. Code art. 2026.

[82] La.Civ. Code art. 2027.

[83] Ridgedell v. Succession of Kuyrkendall, 740 So.2d 173, 179 (La.App. 1 Cir. 1999).

basis for a direct ownership interest in the property transferred to the non-debtor defendants. Thus, the Judge determined that this was an estate claim that could only be brought by the trustee. Again, for the reasons previously mentioned, we find that the amended complaint, taken as true sufficiently alleges a direct ownership interest in the Angiorad joint venture and that this state law cause of action can be brought by Dr. Joyner.

*Aiding and abetting fraud and conversion*

In his amended complaint, Dr. Joyner alleges that the non-debtor defendants aided and abetted Liprie's fraudulent conduct towards Dr. Joyner. He seeks not only rescission of the donations/transfers, but also damages for the non-debtor defendants' conduct. Dr. Joyner asserts these claims based on Louisiana's law on conspiracy which imposes *in solido* liability on the conspirators.[84] Dr. Joyner specifically alleges that the non-debtor defendants conspired to commit conversion and fraud. "Conversion is defined as an act in derogation of the plaintiff's possessory rights or any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently, or for an indefinite time."[85] Dr. Joyner alleges that the non-debtor defendants knew that they received his $4.3 million in Angiorad profits from the joint venture. He further alleges that defendants aided and abetted Liprie's fraudulent conduct by keeping and benefitting from his stolen property interest. Dr. Joyner argues that these causes of action cannot be brought by the Bankruptcy Trustee because it involves property that never belonged to Liprie, or his estate.

---

[84] La.Civ.Code art. 2324(He who conspires with another person to commit an intentional or willful act is answerable, *in solido,* with that person for the damages caused by such act.).

[85] Chrisler Credit Corp. v. Whitney Nat. Bank, 51 F.3d 553 (1995).

The Bankruptcy Judge determined that this claim was grounded on alleged fraudulent conveyances recoverable solely by the Trustee for the benefit of the estate because the amended complaint did not allege a basis for damages resulting from a direct injury to Dr. Joyner that is separate and independent from the Trustee's claims. For the reasons already stated we respectfully disagree and find that Dr. Joyner may assert this cause of action.

*Nullity for breach of public policy*

In this cause of action, Dr. Joyner alleges that Liprie and his hired professionals created a series of entities or enterprises, including non-debtor defendants. He remarks that neither Dr. Joyner nor Liprie owed the enterprises any money and that Liprie transferred Dr. Joyner's money in bad faith. Dr. Joyner maintains that because the non-debtor defendants have been enriched without cause and at his expense, such transfers are null for breach of public policy and the non-debtor defendants must restore and/or account for the transfers plus pay all damages, interest, civil fruits and attorney fees.[86]

To support this cause of action, Dr. Joyner cites Louisiana Civil Code article 2030 which provides that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral.[87] A contract that is absolutely null may not be confirmed

---

[86] Id. ¶ 116 and 117.

[87] Louisiana public policy does not permit a potential debtor to transfer property to someone else in order to secrete it from potential creditors, in essence, for an illicit purpose. This applies to transfers made at the time that a cause of action accrues *before* a potential creditor files a suit or obtains a judgment. Dugas v. Dugas, 804 So.2d 878, 881 (La.App. 3 Cir. 12/26/01), writ denied 816 So.2d 307 (La.5/24/02).

and is imprescriptible.[88] Dr. Joyner alleges that Liprie's donations violate public policy because they concern property which never belonged to Liprie's estate.

The Bankruptcy Judge considered this nullity action to be a claim seeking to avoid a fraudulent conveyance. The judge concluded that because Dr. Joyner failed to plead a basis for a direct ownership interest in the property transferred to the non-debtor defendants, this claim would be dismissed because Dr. Joyner lacked standing to bring the claim. Again, we respectfully disagree and find that Dr. Joyner may assert this state law cause of action.

*Management of affairs of another*

Dr. Joyner alleges that the non-debtor defendants are liable under Louisiana Civil Code article 2295 to the extent that they managed his assets without his authority. Code article 2295 provides that "[t]he manager must exercise the care of a prudent administrator and is answerable for any loss that results from his failure to do so." In dismissing this claim, the Bankruptcy Judge reasoned that the claim was dependent on Dr. Joyner's allegation that the Angiorad proceeds transferred to the non-debtor defendants were his property. As such, he concluded that the amended complaint failed to support his claim of "direct ownership interest in the Angiorad proceeds based on the Liprie I [sic] judgment."[89] For the reasons set forth above, we respectfully disagree and find that Dr. Joyner does have standing to assert this state law claim.

*Louisiana Racketeering Act*

Dr. Joyner asserts a violation of Louisiana Revised Statute 14:67 which constitutes

---

[88] Funk v. Clement, 925 So.2d 717, 720 (La.App. 3 Cir. 2006), writ denied, 936 So.2d 1270 (La. 9/15/06).

[89] Memorandum Opinion, R. #5-37, p. 34.

racketeering activity under Louisiana Revised Statute 15:1352. Dr. Joyner alleges that over a three year period, Liprie's repeated violations of Louisiana Revised Statute 14:67 constituted a pattern of racketeering which included breaches of fiduciary duties, intentionally defrauding Dr. Joyner out of the Angiorad profits, fraudulently concealing those profits and placing them in a series of enterprises, including non-debtor defendants.[90] The non-debtor defendants knowingly received the proceeds that were derived, directly or indirectly from Liprie's pattern of racketeering activity,[91] and/or by knowingly maintaining their direct or indirect investment or control of the enterprises at issue.[92]

Louisiana Revised Statute 15:1352(A) provides:

> "Racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating anther person to commit any crime which is punishable under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950 or the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law. . . .

Predicate offenses that support a racketeering claim include theft under Louisiana Revised Statute 14:67 which states that:

> Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

The Bankruptcy Judge determined that this cause of action must be dismissed because the

---

[90] Amended Complaint, ¶ ¶ 121, 122, 123.

[91] Id. ¶ 125.

[92] Id. ¶ 126.

factual basis arises from the same transaction or series of transactions underlying Liprie I [sic][93] and is barred by *res judicata*. The Judge determined that this claim was or could have been litigated in Liprie I [sic].

Generally *res judicata* bars re-litigation of a final judgment between the same parties. Dr. Joyner maintains that Louisiana law provides the *res judicata* principles governing this case relying on Lafreniere Park Found. v. Broussard,.[94] Liprie II was rendered by a Louisiana state court. Dr. Joyner maintains that applying Louisiana's test clearly does not bar Dr. Joyner's claims. Louisiana has established five elements that must be satisfied to find that an action is barred by *res judicata:*

> (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation.[95]

Dr. Joyner asserts that the parties in the suit (Liprie III) are different than the parties in Liprie II. Liprie II included Dr. Joyner and Liprie. In both the common law and the civil law, in order for a second suit to be barred by the doctrine of *res judicata*, the parties must appear in the same capacities in both suits.[96] This suit involves Dr. Joyner, Liprie and the non-debtor defendants who

---

[93] Again, we are referring to Lirpie II.

[94] 221 F.3d 804, 808 (5 th Cir. 2000) ("To determine the preclusive effect of a prior Louisiana court judgment, if any, this court must apply Louisiana law."); Shelton v. Bd of Supervisors of S. Univ. & A& M College., 2012 WL 75040 (M.D. La. Jan. 10, 2012)(holding that under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must apply state *res judicata* principles to determine preclusive effect of state-court judgments).

[95] Chevron U.S.A., Inc. v. State, 993 So.2d 187,194 (La. 9/8/08) quoting Burguieres v. Pollingue, 843 So.2d 1049 (La.2/25/03); La. R.S. 13:4231.

[96] Burguieres v. Pollingue, 843 So.2d 1049 (La.2003).

are juridical persons. Thus, the parties are not the same.

Dr. Joyner next maintains that the operative facts in Liprie II are not the same as in the instant suit. In Liprie II, Dr. Joyner sued Liprie for breach of fiduciary duty in the late 1990s. However, the instant suit, while related involves transactions that happened years later. Dr. Joyner remarks that he did not even learn about the transactions until after Liprie II was final; he discovered the transactions during the discovery phase of the debtor examination. Liprie II involves Dr. Joyner's claims of breach of fiduciary duty to establish his ownership interest in the joint venture whereas, Liprie III involves claims against Liprie and the non-debtor defendants for the return of stolen property (the profits from the joint venture), its civil fruits and attorney fees. We find merit to Dr. Joyner's argument and find that *res judicata* does not apply to bar Dr. Joyner's racketeering claims.

Next, the Bankruptcy Judge concluded that the amended complaint does not support an ownership interest and thus the recovered property constitutes property of the bankruptcy estate under 11 U.S.C. § 541(a)(3), and/or are grounded on fraudulent conveyance allegations that are derivative of the trustee's rights and remedies under sections 544(b) and 550(a). We respectfully disagree and find that the amended complaint does allege an ownership interest and find that Dr. Joyner may assert the Louisiana racketeering claims.

*Single business enterprise and alter ego*

Dr. Joyner asserts that Liprie and the non-debtor defendants were a single business enterprise and that the non-debtor defendants were alter egos of the debtor. The Bankruptcy Judge determined that these claims, like Joyner's other claims, are grounded in alleged fraudulent transfers, the recovery of which are reserved for the Chapter 7 Trustee. For the reasons already given, the court finds that Dr. Joyner has sufficiently alleged his ownership interest and can assert this state law cause

of action.

*Quasi-contract, reimbursement and unjust enrichment*

Dr. Joyner asserts that Liprie's donations to the various enterprises (non-debtor defendants) were fraudulent and in bad faith. Dr. Joyner maintains that because these non-debtor defendants have been enriched without cause at Dr. Joyner's expense, they must restore and/or account for his interest in the profits of the joint venture, under their quasi-contractual duties, plus pay all damages, interest, civil fruits, and attorney fees. Louisiana Civil Code article 2303 which provides that "[a] person who in bad faith received a payment or thing not owed to him is bound to restore it with its fruits and product." If the thing transferred no longer exists, "[a] person who received the thing in bad faith is bound to restore its value even if the loss was not caused by his fault."[97] "If he received the thing in bad faith, he owes, in addition, damages to the person to whom restoration is due."[98]

The Bankruptcy Judge determined that the allegations for these claims did not support a separate and independent claim for an injury to Dr. Joyner that is not derivative of the estate's claims under § § 544 and 550. Dr. Joyner argues that these claims are not properly brought by the Bankruptcy Trustee because they concern property which never belonged to Liprie's estate and because Dr. Joyner seeks damages stemming from tortious activity by the non-debtor defendants. We agree and find that Dr. Joyner may assert these state law claims.

*Accounting and injunctive relief*

Dr. Joyner maintains that the Bankruptcy Judge erred in finding that these causes of action

---

[97] La. Civ. Code art. 2304.

[98] La. Civ. Code art. 2305.

are "derivative of his substantive claims discussed above."[99] Dr. Joyner argues that he has standing to bring these claims due to his ownership interest in the Angiorad technology. We agree that Dr. Joyner sufficiently alleges his ownership interest as explained above and find that Dr. Joyner may assert these state law causes of action.

*Subject matter jurisdiction*

Dr. Joyner asserts that the state law claims which were originally filed in state court are exclusively based on state law; consequently, because the subject property is not part of the bankruptcy estate and does not arise in or under Bankruptcy Law, the instant suit should be remanded back to the state court for further adjudication. Finding that Dr. Joyner had failed to allege sufficient facts to establish a direct ownership interest, the Bankruptcy Judge concluded that all of Dr. Joyner's claims were claims that could only be asserted by the Bankruptcy Trustee, and thus Dr. Joyner lacked standing to assert the state law claims. As noted above, we respectfully disagree and reject the Bankruptcy Judge's conclusions. We find that the claims alleged by Dr. Joyner, taken as true, are not property of the bankruptcy estate under 11 U.S.C. § 541 and Dr. Joyner does have standing to assert these claims. As such, we further find that this is not a core proceeding under 11 U.S.C. § 157(b)(2)(H) because the state law claims are not estate property– but allegedly involve transactions that fraudulently conveyed Dr. Joyner's stolen property.

Federal courts must be assured of their subject matter jurisdiction at all times and may question it *sua sponte* at any stage of judicial proceedings.[100] 28 U.S.C. § 1334(b) grants jurisdiction

---

[99] Memorandum Opinion, R. #5-37, p. 37.

[100] 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3522, at 66-72 (2d ed. 1984).

to district courts and adjunct bankruptcy courts that entertain proceedings "arising under," "arising in a case under," or "related to" a case under Title 11 of the United States Code. Thus, we must determine whether this matter is related to the bankruptcy.[101] "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankruptcy estate."[102] In other words, this proceeding must be capable of affecting the bankrupt estate for it to be "related to" the bankruptcy.

In the instant matter, there is a dispute as to property (the Angiorad profits Dr. Joyner alleges were stolen from him as part of his ownership interest in the joint venture) that is not currently property of the bankrupt estate– property that is in the Liprie Trust and SFL as well as assets purchased with money from the Angiorad joint venture. If Dr. Joyner succeeds on the merits of his claims, and any of the transactions are rescinded, that property would then potentially be returned to its alleged rightful owner; it would never become part of Liprie's bankrupt estate.

The non-debtor defendants maintain that under 11 U.S.C. § 544, the Trustee has exclusive standing to recover fraudulently transferred estate property. However, Dr. Joyner's state law claims, if successful, would preclude that particular property from ever becoming **estate** property because it never belonged to Liprie. Thus, the Trustee would not be able to take any action that could potentially bring that property into the estate. Consequently, that would not affect the administration of the estate or the obligations of the debtor.

---

[101] Walker v. Cadle Co, 51 F.3d 562, 569 (5th Cir. 1995) quoting Wood v. Wood, 825 F.2d 90, 93.(5th Cir. 1987).

[102] Walker, 51 F.3d at 569.

Dr. Joyner argues that *res judicata* and the full faith and credit principles would prohibit the bankruptcy court from looking behind the state law issues decided by the state court judgment. Specifically, a successful state court judgment would prohibit the Trustee from utilizing 11 U.S.C. § 544 to avoid Liprie's transfer of Dr. Joyner's assets because Dr. Joyner's assets were never the assets of Liprie's estate.

Dr. Joyner submits that he is the only creditor of the estate. Therefore, he argues that his actions against SFL and Deutsche could not, practically speaking, affect the administration of the debtor's estate. Dr. Joyner's claims for damages against the non-debtor defendants would not affect the administration of the estate and the claims against Liprie are stayed automatically.

Dr. Joyner cites several cases wherein it was held that a bankruptcy court lacked jurisdiction to hear claims that are not the property of the estate.[103]

Dr. Joyner's claims are not core proceedings, therefore the Bankruptcy Judge cannot enter a final judgment, but may only make proposed findings of fact and conclusions of law. Dr. Joyner argues that in his original state court petition, he requested a jury trial and it would be unconstitutional to allow the matter to proceed before the bankruptcy court because he would be deprived of his right to a jury trial. A Bankruptcy court lacks authority under Article III to enter a

---

[103] In re Ozark Restaurant Equipment Co., 816 F.2d 1222, 1224 (8 Cir. 1987)(claims of creditor to pierce the corporate veil of non-debtors belong to the creditor, thus "it is axiomatic that the claim does not become property of the estate under Section 541(a)(1);" In re Lemco Gypsum,Inc., 910 F.2d 784, 789 (11 Cir. 1990)(no "related-to" jurisdiction when property is not part of debtor's estate); In re Walker, 51 F.3d 562 (5th Cir. 1995)(bankruptcy court lacks subject matter jurisdiction over creditor's third-party complaint for contribution); In re Tap, Inc., 52 B.R. 271, 279 (Bkrtcy. D. Mass. 1985) (property obtained by fraud of the debtor of another is not part of the debtor's estate); In Re Teltronics, 649 F.2d 1236, 1239 (7 Cir. 1981)(property obtained by fraud of the bankrupt is not part of the bankruptcy estate).

final judgment for claims that arise under state law.[104] Thus, the state law claims must be tried before either the district court or the state court.

We find that the we lack subject matter jurisdiction over the state law causes of action, therefore, the Bankruptcy court also lacks subject matter jurisdiction. Accordingly, we will vacate our previous order referring the matter to the Bankruptcy court and remand the matter to the state court.

## CONCLUSION

Because we find that Dr. Joyner's claims are non-core proceedings, we consider the Bankruptcy Judge's Memorandum Opinion as a report and recommendation under 11 U.S.C. § 157(c)(1). Based on the foregoing, the court finds that Dr. Joyner has alleged sufficient facts to establish state law claims that are separate and independent claims and not derivative of the estate claims under 11 U.S.C. § § 544 and 550. Therefore, we find that Dr. Joyner has standing to assert the claims in the amended complaint. However, we adopt the recommendation of the bankruptcy judge and dismiss with prejudice Dr. Joyner's claims of a resulting or constructive trust.[105] [106] Furthermore, we find that because the complaint asserts only state law claims that are not the property of the bankrupt estate, we will vacate our previous order in Joyner v. Liprie, et al, 2:11-0308( R. # 34) referring the matter to the Bankruptcy Court and will direct the clerk of court to remand the instant matter to the state court.

---

[104] Stern v. Marshall, 131 S.Ct. 2594 (2011).

[105] We determined this action must be dismissed because there is no prior court order establishing a trust.

[106] Dr. Joyner has withdrawn without prejudice Count V (aiding and abetting breach of fiduciary duty) Appellant brief, fn. 2, p. 23, R. #8.

The Court is of the opinion that the decision rendered in this matter involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Hence, pursuant to Rule 1292 (b) of the Federal Rules of Civil Procedure the Court will grant a certificate of appealability, if application is made within ten days after the entry of this order.

The remand of this matter will be delayed for a period of 10 days, after which, if no appeal is taken, the clerk of court will be directed to remand the proceeding to the state court.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 4th day of January, 2013.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE